INDIANAPOLIS BLOOMINGTON AND WESTERN R. R. Co.

v.

MICHAEL J. FLANIGAN.

1. NEGLIGENCE—*suffering cars to get out of repair.* If the coupling of a freight car suddenly becomes out of repair, the railway company using the same will not be liable for an injury to an employee, received in consequence thereof, unless its attention had been called to the defect, or the company, by the exercise of a high degree of care, could have discovered the defect, and had an opportunity to make the needed repairs.

2. SAME—*use of buffers requiring greater care in coupling cars.* A railway company will not be liable to an employee for personal injury received while coupling cars having double buffers, simply because a higher degree of care is required in using them than in those differently constructed.

3. RAILROADS—*liability for injury to employee.* If a servant of a railway company knows that the company is operating a class of cars which are unsafe, when he enters its service, and he continues in the same, he will assume the risks and hazards of the service, and can not recover for a personal injury from the use of such a class of cars, the company being guilty of no negligence.

4. SAME—*servant of, assumes the risks incident to his service.* An employee assumes all the ordinary hazards arising from the performance of his voluntary engagements. If a servant of a railway company receives a personal injury, while in the discharge of his duties, from any cause outside the ordinary dangers of the service, and it is not the result of unusual or unexpected perils, or the negligence of the company, he can not recover damages from the company.

5. A very different question arises where the servant of a railway company is injured by the use of a car defective and unfit for service when received, or when the company suffers it, while in its possession, to be out of order and unsafe, and the defect is not known to the servant before the injury.

6. NEGLIGENCE—*comparative.* In a case involving the question of mutual negligence of the parties, it is error to instruct the jury that the plaintiff may recover, if the defendant is guilty of more negligence than that of the plaintiff, in causing the injury. No such rule of liability is recognized, in cases of mutual negligence, as that of a greater degree on the part of the defendant.

APPEAL from the Circuit Court of Tazewell county; the Hon. JOHN BURNS, Judge, presiding.

This was an action on the case, by Michael J. Flanigan, against the Indianapolis, Bloomington and Western Railroad Company. The opinion of the court states the nature and facts of the case with sufficient fullness. The plaintiff recovered judgment in the circuit court, for the sum of $6000, from which the defendant appealed.

Mr. John B. Cohrs, for the appellant.

Messrs. Whitney & Foster, and Messrs. Roberts & Green, for the appellee.

Mr. Justice Scott delivered the opinion of the Court:

Plaintiff in this suit was a freight conductor on defendant's railroad. While in that service, it was a part of his duty, when occasion required it, to couple cars. He had been directed to leave at Mansfield station four empty freight cars belonging to the Baltimore and Ohio Railroad Company. It was about midnight when he arrived at the station, and, in setting off the cars, he found it would be necessary, in order to clear the crossing. to couple one of them with a White Line car that had previously been standing on the side-track. Both cars had attached what are called "double buffers," the use of which is well understood by railroad men. The draw-bars in use on these cars have two apartments, to facilitate coupling with other cars of different height. Plaintiff first undertook, in his effort to make a coupling, to remove the pin in the draw-bar of the stationary car, but finding he would be unable to get it out, owing to some unexplained difficulty, before the approaching car would be upon him, he attempted, in his haste, to place the link in the lower apartment. By some most unfortunate movement, his arm was caught between the dead-wood attached to the cars, and so badly crushed that it had to be amputated.

Counsel assert two propositions on which it is sought to maintain the judgment in favor of plaintiff—

*First*—Had the draw-bar on the still car been properly constructed, or in proper repair, so that the pin could have been drawn and the link changed to the upper apartment of the draw-bar, plaintiff would not have been injured in making, or attempting to make, the coupling.

*Second*—Had the car to be coupled, or either of them, not been equipped with double buffers, plaintiff would not have been injured.

Barring the objection it is not averred in the declaration plaintiff was injured by reason the draw-bar was improperly constructed, or that it was at the time out of repair, we do not think the evidence shows the railroad company was guilty of negligence in either particular assumed in the first proposition. There is absolutely no testimony that tends to show the draw-bar was not constructed after the most approved pattern. No witness ventures an opinion it was not well adapted to the purpose for which it was intended. Whether it was because it was out of repair plaintiff could not remove the pin readily, and if so, was it recent, the evidence fails to show. Had it suddenly become out of order. it can hardly be insisted defendant would be liable, unless attention had been called to the defect, or the company, by the exercise of a high degree of care, could have discovered it, and opportunity afforded in which to make the needed repairs. A contrary doctrine would impose a liability so strict as would make railroad companies insurers against all accidents and injuries to their employees. The law has laid upon them no such obligation.

But the case seems to have been tried in the court below on the theory assumed in the second proposition, viz: that it was negligence in defendant to permit cars to be used and operated on its road equipped with "double buffers."

The cars alleged to have produced the injury to plaintiff were cars belonging to other companies—one to the White Line and the other to the Baltimore and Ohio Railroad Company. They had been received from connecting lines, and

are that class of cars used almost exclusively in carrying through freights, and but seldom in local business. The custom is to distribute such cars empty at the several stations, and when loaded, send them to the sea-board or any distant points. Cars of this peculiar pattern and construction, for the transportation of through freights, are to be found in greater or less numbers upon all railroads in this State, and indeed upon all connecting lines in the whole country, of the same guage. Many of the most important and best conducted railroad companies in the United States have their cars for carrying through freights constructed with "double buffers." The proof shows they give greater strength to the cars, by distributing more evenly the shock when they come together, as they often do, with great violence, affording better protection, not only to the car itself, but to the contents. Other advantages are claimed for them over cars constructed with single buffers, in turning short curves, and when it becomes necessary to push them, in ascending steep grades, with an engine in the rear.

Defendant's own cars used for its local business are constructed with the single dead-wood, directly above the draw-bar. Most, if not all the railroads in the State, use cars constructed in the same way for the local transportation; but upon the great and leading railroads of the State are to be found in constant use these foreign cars equipped with double dead-wood. It is the general custom to receive these cars from all connecting lines, and run them upon their own roads, only taking care that they are in good repair. Foreign cars are interchangeably used on all the principal railroads in the United States, and no company could do any considerable amount of freighting business that did not conform to this general usage.

No discrimination has ever been made, so far as the evidence in this record shows, against cars constructed with double dead-wood. They are so universally found on all railroads in the State, that every railroad man, at all familiar

with running mixed trains, must know of their constant use. It is a matter of general notoriety with persons engaged at railroad business.

Among railroad employees, and especially among brakemen. there seem to be a great many objections to cars with dead-wood on either side of the draw-bar. They prefer cars with the single bumper. Much testimony, from persons competent to give an opinion, is found in this record on the comparative safety of the different cars in use. While they most generally give it as their opinion that cars with the single dead-wood over the draw-bar are the safest, still it is proven that, with care, cars with dead-wood on both sides of the draw-bar may be operated with entire safety. More or less danger is experienced in coupling any cars, no matter what coupling is used, and accidents are of frequent occurrence. Perhaps it requires more care, but with the exercise of a higher degree of caution, there is really no more danger in coupling cars with the double than the single dead-wood. The advantages possessed by this class of cars can not be dispensed with because a little more care must be observed in operating them. That, with proper care, they may be operated with safety to the employees, is fully established by the evidence.

The averment in the declaration is not that these cars were not in perfect order, but that the original construction is faulty, in having upon them the double bumpers. If plaintiff knew such cars were in use, and that they were unsafe, he ought not to have taken service with defendant. Prior to his engagement, defendant, in common with all other railroad companies in the State, had been drawing cars of this particular make. Their character must have been generally known. They were known to be safe if care was used in operating them, but dangerous, like all railroad labor, unless unusual caution was observed.

Notwithstanding plaintiff had had large experience in railroading in this State, both as a brakeman and a freight conduc-

24—77th Ill.

tor, he says he had no previous experience in coupling cars constructed with double dead-wood when he entered upon his employment with defendant.  Conceding this fact, we do not see how it could enlarge the liability of the company.  It was a notorious fact such cars were not only in use on defendant's road, but upon all other roads in the State.  Plaintiff had seen them on defendant's road, and he ought to have acquainted himself with the manner of operating them.  Such cars could be used with safety, and to have refused to draw them over its road, would have seriously impaired the freighting business of the company.  Defendant had the right to presume plaintiff entered its service with the knowledge cars of that construction were in daily use on its road.  The fact it required more care, and perhaps dexterity, to make a coupling with cars having dead-wood on both sides of the drawbar, was well known to all persons familiar with railroading; and the presumption will be indulged plaintiff contracted upon the implied assurance he possessed the requisite skill to do the work the company wanted done.  The rule of law always has been, the employee assumes all ordinary hazards arising from the performance of the duties of his voluntary engagement.  Plaintiff was not injured by any cause outside the ordinary dangers of the service, that could not have been foreseen or anticipated by him.  He was exposed to no unusual or unexpected perils by any negligent conduct of defendant.  The history of railroad labor shows it is full of danger to the employees, even with the exercise of the utmost skill and care.  That fact was known to plaintiff before he entered upon his undertaking, and if he was injured by any of the ordinary perils of the service, however sad the consequences, the law will afford him no remedy.

Plaintiff's engagement with defendant was for no definite period.  If he discovered the service was rendered more dangerous than he had anticipated, by the use of these foreign cars, he was under no obligation to continue in it.  He had been employed by the trip, and was at liberty to quit at any

time.  He had made nine and a half trips before the accident, and in every train he had some of the foreign cars of the objectionable make.  In that length of time, he ought to have observed their construction.  What he contends was dangerous in them, was plain to be seen.  It was unlike a secret defect that could not be discovered.  Opportunity was afforded to ascertain and become familiar with the service, and if he was unwilling to assume its common risks, it was his privilege to abandon it.

A very different question would arise had the injury to plaintiff been produced by a car defective and unfit for service when it was received, or had defendant suffered it, while in its possession, to become unsafe; but that question can not arise in this case.  The cars were in perfect order, so far as the evidence shows, when they were received, and hence, defendant was guilty of no negligence in receiving them upon its line of road.

The case of *T., W. and W. Ry. Co.* v. *Fredericks* (Jan. term, 1874), is cited with great confidence as being an authority exactly in point, but the decision in that case rests upon an entirely different principle.  The vice that produced the injury in that case was not peculiar to a class, but to a particular car.  The draw-bar was too short. and it appeared, had it been of the usual length, the accident would not have happened.  The evidence was full to the point, any mechanic, by a casual inspection, could tell the particular coupling attached to the car was dangerous, before it was ever used.  From the notorious bad reputation, it was concluded the company must have known the fault existed in the draw-bar.  It could not be readily discovered by any one just entering upon the service.  Plaintiff had been but a brief period in the employment of the defendant, and it was thought he did not know of the defect.  Had it been observable by ordinary care, it would have been the duty of plaintiff to have quit the service.  Failing to do so, the law would presume he was willing and did assume the hazards.  The decision is placed on that dis-

tinct ground. The case at bar is clearly distinguishable from Fredericks' case, both in the facts and the principle upon which the decision is placed.

The modifications to defendant's instructions seem to have been made under a misapprehension of the doctrine of comparative negligence as declared by this court. The court added to the ninth instruction these words: "unless defendants were guilty of more negligence, as aforesaid, in causing the injury." This is not the law. The decisions in this court recognize no such rule of liability, in cases of mutual negligence, as that of a greater degree on the part of the defendant. *C. and A. R. R. Co. v. Mack* (Jan. term, 1874). We have had occasion so frequently to declare the doctrine on that question, we deem it unnecessary to do more than to refer to our former decisions.

As shown by the evidence, plaintiff was a faithful employee, and, while in the discharge of his duty, suffered the loss of his right arm; but with the most favorable consideration, we are unable to discover any tenable ground upon which to base an affirmance of the judgment in his favor. The accident can, with as much propriety, be attributed to his own want of skill, or perhaps to his want of due care, as to any other cause.

The judgment must be reversed.

*Judgment reversed.*