CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY V.
WILLIAM H. CURTIS.

FILED MAY 5, 1897.　No. 7103.

1. **Railroad Companies: CARS: TRANSPORTATION.** It is one of the duties of a railroad company, as a common carrier, to receive and transport over its line of road cars of other companies, if the gauge of the road is suitable and the cars are not defective or out of repair, or of such unusual and peculiar construction as to be unreasonably hazardous or dangerous to work with or handle.

2. **Master and Servant: RISKS OF EMPLOYMENT: RAILROAD CARS: COUPLINGS.** That a car belonging to a road other than the one on which a brakeman is employed is equipped with double deadwoods or buffers is a fact which is open, apparent, and obvious to any person attempting to couple the car; hence, any risk attendant on such coupling is of the hazards incident to the duty and assumed by the employe; and this is true notwithstanding the cars in general use on the road on which the brakeman is employed are equipped differently, or with single deadwoods.

3. ——: ——: ——: ——. The evidence adduced in regard to a coupling knife and its use in coupling cars equipped with double deadwoods *held* insufficient to establish or sustain a finding that it was negligence of the company not to furnish the defendant in error such a knife.

4. **Railroad Companies: RELIEF DEPARTMENT: RELEASE OF LIABILITY FOR INJURY: VALIDITY OF CONTRACT.** The contract signed by an employe of the railroad company on becoming a member of what was known as the "Burlington Voluntary Relief Department," to the effect that if he should be injured and receive moneys from the relief fund of said relief department on account thereof, the acceptance of such moneys should operate as a release of such employe's claim against said railroad company for damages because of such injury, construed, and *held*, (1) that such contract of an employe did not lack consideration to support it; (2) that the promise made by the employe to the relief department for the benefit of the railroad company was available to the latter as a cause of action or defense; (3) that such contract was not contrary to public policy; (4) that the effect of such contract was not to enable the railroad company to exonerate itself by contract from liability for the negligence of itself or servants; (5) that the employe did not waive his right of action against the railroad company, in case he should be injured by its negligence, by the execution of the contract; (6) that it is not the execution of the contract that estops the injured employe, but his acceptance of moneys from the relief department on account of his injury after his cause of action against the railroad on account thereof arises.

Chicago, B. & Q. R. Co. v. Curtis.

The doctrine announced in the second paragraph of the syllabus to the opinion in the case of *Chicago, B. & Q. R. Co. v. Bell*, 44 Neb., 44, approved and followed.

ERROR from the district court of Jefferson county. Tried below before BUSH, J.    *Reversed.*

The opinion contains a statement of the case.

*J. W. Deweese*, for plaintiff in error:

A foreign freight car tendered for shipment is personal property, and a railroad company is required to receive it and haul it the same as any other freight. (*Peoria & P. U. R. Co. v. Chicago, R. I. & P. R. Co.*, 109 Ill., 137.)

The brakeman assumed the risk of injury from coupling cars coming from another road and having coupling apparatus different from the ordinary car. It was the duty of the company to receive the car. Negligence of a carrier cannot be predicated upon the performance of a duty required by law. (*Thomas v. Missouri P. R. Co.*, 53 Am. & Eng. R. Cas. [Mo.], 146; *Michigan C. R. Co. v. Smithson*, 45 Mich., 214; *Baldwin v. Chicago, R. I. & P. R. Co.*, 50 Ia., 680; *East Tennessee, V. & G. R. Co. v. Turvaville*, 12 So. Rep. [Ala.], 64; *Kohler v. Schwenk*, 22 Atl. Rep. [Pa.], 911; *Titus v. Bradford, B. & K. R. Co.*, 20 Atl. Rep. [Pa.], 517; *Toledo, W. & W. R. Co. v. Black*, 88 Ill., 114; *Kohn v. McNulta*, 147 U. S., 240; *Indianapolis, B. & W. R. Co. v. Flanigan*, 77 Ill., 365; *Hathaway v. Michigan C. R. Co.*, 51 Mich., 253; *Atchison, T. & S. F. R. Co. v. Meyers*, 76 Fed. Rep., 443; *Tuttle v. Detroit, G. H. & M. R. Co.*, 122 U. S., 189; *Ladd v. New Bedford R. Co.*, 119 Mass., 412; *Northern P. R. Co. v. Blake*, 63 Fed. Rep., 45; *Kelly v. Wisconsin C. R. Co.*, 23 N. W. Rep. [Wis.], 890; *Darracutts v. Chesapeake & O. R. Co.*, 2 S. E. Rep. [Va.], 513; *Menominee River S. & D. Co. v. Milwaukee & N. R. Co.*, 65 N. W. Rep. [Wis.], 176; *Pittsburgh & L. E. R. Co. v. Henley*, 29 N. E. Rep. [O.], 575; *Norfolk & W. R. Co. v. Brown*, 22 S. E. Rep. [Va.], 496.)

It was not the carrier's duty to warn an experienced employe. (*Yeager v. Burlington, C. R. & N. Y. R. Co.*, 61 N.

W. Rep. [Ia.], 215; *Secord v. Chicago & M. L. S. R. Co.*, 65 N. W. Rep. [Mich.], 550.)

The contract under which the brakeman accepted benefits from the Burlington Voluntary Relief Department and released the railroad company from liability for damages is valid and binding, and prevents him from recovering in this action. (*Chicago, B. & Q. R. Co. v. Wymore*, 40 Neb., 645; *Burlington Voluntary Relief Department v. White*, 41 Neb., 547; *Shaver v. Pennsylvania R. Co.*, 71 Fed. Rep., 931; *Johnson v. Philadelphia & R. R. Co.*, 29 Atl. Rep. [Pa.], 854; *Graft v. Baltimore & O. R. Co.*, 8 Atl. Rep. [Pa.], 206; *Spitze v. Baltimore & O. R. Co.*, 23 Atl. Rep. [Md.], 307; *Owens v. Baltimore & O. R. Co.*, 35 Fed. Rep., 718; *Black v. Baltimore & O. R. Co.*, 36 Fed. Rep., 655; *Fuller v. Baltimore & O. E. R. Ass'n*, 10 Atl. Rep. [Md.], 237; *Kinney v. Baltimore & O. E. R. Ass'n*, 53 Am. & Eng. R. Cas. [W. Va.], 34; *Donald v. Chicago, B. & Q. R. Co.*, 61 N. W. Rep. [Ia.], 971; *Leas v. Pacific R. Co.*, 37 N. E. Rep. [Ind.], 423.)

*A. W. Agee*, also for plaintiff in error.

*W. H. Woodward, contra:*

A brakeman in coupling cars has a right to assume that they are in good and safe condition, and it is not contributory negligence for him to run in between the cars without stopping to examine whether the drawheads are proper or not. (*King v. Ohio R. R. Co.*, 8 Am. & Eng. R. Cas. [U. S. C. C. Dist. of Ind.], 119.)

It is negligence to receive a dangerous foreign car, though sound in construction. (*Gottlieb v. New York, L. E. & W. R. Co.*, 24 Am. & Eng. R. Cas. [N. Y.], 422; *Mackin v. Boston & A. R. Co.*, 135 Mass., 201.)

A railroad company cannot escape responsibility from defective carriages by borrowing them from another. (*Jetter v. New York & H. R. R. Co.*, 2 Abb. [N. Y.], 458.)

A brakeman who knows nothing of the danger of coupling cars having double deadwoods, and who has but a

few seconds to observe and act, is not negligent, as a matter of law, in not noticing that double deadwoods would meet and injure him.  (*Reynolds v. Boston & M. R. Co.*, 53 Am. & Eng. R. Cas. [Vt.], 178.)

A railroad company is liable for injuries to a brakeman crushed between cars, unprovided with bumpers, which he was suddenly called upon to couple without previous information as to their condition.  (*Mason v. Richmond & D. R. Co.*, 53 Am. & Eng. R. Cas. [N. Car.], 183; *O'Hare v. Chicago & A. R. Co.*, 95 Mo., 662.)

A master is required to exercise ordinary care to make the service reasonably safe.  (*Abel v. President D. & H. C. Co.*, 128 N. Y., 662; *McGovern v. Central V. R. Co.*, 123 N. Y., 280; *Dorsey v. Phillips & C. C. Co.*, 42 Wis., 597.)

A danger unknown to the servant, arising from a breach of duty of the master, is actionable where injury results, and such danger is not a risk of employment.  (*King v. Ohio R. Co.*, 14 Fed. Rep., 277; *Gibson v. Pacific R. Co.*, 46 Mo., 170; *Huhn v. Missouri P. R. Co.*, 92 Mo., 440; *Baltimore & O. C. R. Co. v. Rowan*, 104 Ind., 88; *Washington & G. R. Co. v. McDade*, 135 U. S., 554; *Goodrich v. New York C. & H. R. R. Co.*, 116 N. Y., 398; *Louisville, N. A. & C. R. Co. v. Frawley*, 110 Ind., 18; *Coates v. Boston & M. R. Co.*, 153 Mass., 297; *Thompson v. Chicago, M. & St. P. R. Co.*, 14 Fed. Rep., 564; *Wheeler v. Wason Mfg. Co.*, 135 Mass., 294; *Smith v. Oxford I. Co.*, 42 N. J. Law, 467; *Baltimore & O. R. Co. v. Baugh*, 8 Am. R. R. & Cor. Cas. [U. S.], 198.)

A common carrier cannot, by contract or otherwise, limit its liability for negligence.  (*Smith v. North Carolina R. Co.*, 64 N. Car., 235; *Railway Co. v. Spangler*, 44 O. St., 471; *Kansas P. R. Co. v. Peavy*, 29 Kan., 169; *Little Rock & Ft. S. R. Co. v. Eubanks*, 48 Ark., 460; *Memphis & C. R. Co. v. Jones*, 2 Head. [Tenn.], 517; *Roesner v. Herman*, 10 Biss. [U. S.], 486.)

HARRISON, J.

The defendant in error instituted this action in the district court of Jefferson county to recover damages alleged

to have resulted from injuries received by him in an attempt to couple together two freight cars of a company other than the plaintiff in error, which were being, or to to be, transported over the line of road or a portion thereof of the plaintiff in error, and which had on them what were known as double deadwoods or buffers. These double deadwoods were of pieces of timber faced with iron, attached on each side of the draw-bar, and extended out from the car as far as the draw-bar, so that they were flush with the end or head of the draw-bar into which the coupling-link was to be inserted in making the coupling. The defendant in error's right hand was caught between the deadwoods and so bruised and mashed that amputation thereof was thought necessary and was performed. Defendant in error was awarded a verdict and judgment in the district court, and the company has prosecuted error proceedings to this court.

The main allegations of the petition filed for defendant in error were, in substance, that cars equipped with double deadwoods were so difficult to couple, and the act of coupling them so dangerous to persons undertaking it, that it was negligence for the company to receive them for transportation on its road; that having received them, it was the duty of the company, when it called on the defendant in error to couple them, to notify him of the peculiarity of the construction of the cars and direct his attention to the double deadwoods; that the failure to give such notice was actionable negligence; also that it was the duty of the company to furnish him with a coupling-knife, in use for making couplings of cars having double deadwoods, with which to make the coupling; that this was not done, which was negligence on the part of the company, which rendered it liable for the consequent injuries to defendant in error. The double deadwoods were referred to and described as follows: "These two freight cars aforesaid had attached to them, where the coupling was made, what is known by railroad men as 'man-killers' or deadwoods, described as follows: The

thickness and depth of said 'man-killers' and deadwoods are each about six inches, the width of each about nine inches, and the height or length of each is about sixteen or eighteen inches, and the width of the draw-bar is about ten inches, making the width from outer edge to outer edge of said 'man-killers' about three feet. The height or depth of the draw-bar is about eight inches, making the heighth or depth of said 'man-killers' about sixteen or eighteen inches."

The answer of the company admitted that defendant in error was injured at the time, place, and in the manner alleged, but of the extent of the injuries alleged a want of knowledge, and demanded proof, and joined issues as to all the other material facts pleaded in the petition. It was affirmatively stated in the answer, in substance, that cars equipped with double deadwoods were reasonably safe, and had been in use for many years on many lines of railroad engaged in interstate transportation; that the two cars which the defendant in error attempted to couple together were tendered to and received by the plaintiff in error in the regular course of the business of interstate shipments, and that it was compelled to accept and transport them over its line of road; "that the situation and use of the double deadwoods on these cars was plain to be seen, and the defendant alleges that whatever injury the plaintiff sustained at said time and place said injury was caused by his own carelessness and negligence and without any fault of this defendant." As a further defense it was stated that there had been organized and was in existence what was called and known as the "Burlington Voluntary Relief Department," of which the defendant in error was a member, and on account of such membership was entitled to certain benefits or payments, in the way of support and maintenance while injured or sick at any time during his employment by plaintiff in error; that the company had guarantied the funds necessary, if any, over and above the regular stated contributions of members to pay all calls on the funds to

meet their designated purposes. (For an extended statement of the plan of this relief department see *Chicago, B. & Q. R. Co. v. Bell*, 44 Neb., 44.)

It was further pleaded in this connection: "That in becoming a member of said association, in consideration of the defendant company agreeing to guaranty the necessary funds for the payment of the expenses of the relief department, and of the dues and claims arising on account of such membership, the plaintiff contracted to and with the said association and company to release the said railroad company from all liability on account of any accident where the plaintiff accepted benefits due to him by reason of such accident and on account of his membership in said association, specifying in his application for membership as follows:

" 'I also agree that in consideration of the amounts paid and to be paid by said company for the maintenance of the relief department, the acceptance of benefits from the said relief fund for injury or death shall operate as a release and satisfaction of all claims for damages against said company arising from such injury or death, which would be made by me or my legal representatives.'

"That shortly after the injury to the plaintiff, he made application to the said relief department for the benefits accruing to him on account of his disability resulting from said injury, and he was duly paid the full amount of benefits accruing to him on account of his membership in said relief department for such disability, from month to month, in accordance with his contract of membership, and he received the said the money as benefits accruing to him on account of his membership in said relief department, which money was paid by the defendant company on account of its guaranty for the furnishing of the necessary funds; that at said time, and prior thereto, the relief department funds fell far short of the amount necessary to satisfy the claims justly due to various sick and injured employes, on account of their membership in said relief department; and the defendant railroad company

furnished the money for carrying out the terms and conditions of the relief department benefits, in accordance with the contract with the plaintiff, as well as the other employes who were members in said department; the exact amount paid by the railroad company for such period the defendant is not at this moment advised." The aggregate or total of the sums paid to defendant in error was also stated.

In a reply the defendant in error denied all new matter set up in the answer; admitted the existence of the relief department, his membership in the same, and his reception of benefits after he was injured. Of the amount received he was not advised and could not definitely state, and among the reasons why this receiving the payment should not bar him of this action, it was pleaded that "plaintiff further alleges the fact to be that before he could engage in the services of said company he was required and compelled to join said Burlington Voluntary Relief Department and become a regular member thereof."

At the first offer of evidence, an objection to the introduction of any was interposed for the company on the ground that the petition was insufficient,—did not state a cause of action. This was overruled, and such action of the trial court is of the errors asigned and presented. When objection is made, during a trial, that the petition is defective, in that it does not state a cause of action, the pleading will be liberally construed and, if possible, sustained. (*Marvin v. Weider*, 31 Neb., 774.) Read and interpreted within the foregoing rule, the petition stated a cause of action in that it raised a question of whether a coupling-knife should have been furnished to defendant in error to use when called on to couple cars on which there were double buffers; also, whether or not the equipment of cars with double deadwoods made the act of coupling so dangerous as to constitute it negligence *per se* to have them on the line of road or to receive them and transport them, as to all the employes who were re-

33

quired to couple them together while they were in transit; and further, whether the company had been negligent in not notifying defendant in error of the presence of these cars and the difference in construction in regard to buffers from those in general use on its line.

There were assignments of error which make necessary an examination of the evidence in connection with the allegations of the pleadings in the light of the rules of law applicable to the points and questions raised, and which have been discussed by counsel. This we will now attempt to do. The first question which it seems proper to notice in regular order is, what was the duty of the railroad company in regard to the reception for transportation of the cars of other lines tendered to it for such purpose? In some states this matter has been regulated by constitutional provision, in others by statute, and in others been held to be a part of the duty of a railroad as a carrier. It was said on this subject in the decision in the case of *Louisville & N. R. Co. v. Boland*, 11 So. Rep. [Ala.], 667: "It may be said it is a matter of common knowledge that the demands and exigencies of commerce require in the transportation of freight that the cars of one company shall be hauled over the road of another, and that, in order to meet this demand, the gauge of the tracks of the great trunk lines have been made uniform. This necessity has been recognized and provided for by statute in many of the states, including Alabama. Section 21 of article 14 of the constitution, and section 1165 of the Code of 1886, carrying the same into effect, make it mandatory on railroads, when required, to transport or draw over its line the passengers, freight, or cars of any intersecting or connecting road, on reasonable terms, provided such cars are adapted to the gauge of its track, are sufficiently strong, and otherwise in proper condition for safe transportation." In the opinion, written by Cooley, J., in the case of *Michigan C. R. Co. v. Smithson*, 7 N. W. Rep. [Mich.], 791, is the following statement: "The primary fact that must rule this controversy is that

the Michigan Central Railroad Company is compelled to receive and transport over its road all the varieties of freight cars which are offered to it for the purpose and which are upon wheels adapted to its gauge. It is compelled to do so, first, because the necessities of commerce demand it. It cannot and would not be tolerated that cars loaded at New York for San Francisco, or at Boston for Chicago, should have their freight transferred from one car to another whenever they passed upon another road. Time would be lost, expense increased, injuries to freight made more numerous, and no corresponding advantage accrue to anyone. It is compelled to do so, second, by its own interest. To attempt to stop every car offered to it at its termini, that the freight might be transferred to its own vehicles, would be to drive away from its line a large portion of its traffic, and compel it to rely upon a local business for which it must increase its charges to make up if possible for what it would lose. But third, the statute itself requires it. It is provided by General Laws, 1873, p. 99, that 'every corporation owning a road in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation.' The necessities of commerce require this with such imperative force that there could scarcely be a more flagrant breach of corporate duty than would be a refusal to obey this law; and the interference of the state to punish could hardly fail to be speedy and effectual."

In the case of *Thomas v. Missouri P. R. Co.*, 18 S. W. Rep. [Mo.], 980, it was observed: "Now, as to the second point proposed for discussion: The constitution of this state declares (art. 12, sec. 13): 'Every railroad company shall have the right, with its road, to intersect, connect with, or cross any other railroad, and shall receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination.' And section 2626, Revised Statutes, 1889, is but a legislative declaration of the same mandate. It will be observed

that this language is mandatory. Under its terms it becomes the imperative duty of every railway company in the state to 'receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination.' Of course, this language, under the operation of a familiar principle, is to receive a reasonable construction, and such construction would obviously exclude damaged cars and cars out of repair, but not those whose construction or coupling apparatus differs from those belonging to or operated by the defendant company. Now, negligence is the result of a failure to perform a duty. From this premise it follows that no course of conduct can justly be termed 'negligent' which results from a simple performance of a duty enjoined by law, to-wit, the reception and transportation of cars from other roads." In Iowa, where a statutory provision prevailed, a similar ruling has been made. It was said: "It must be borne in mind that the question is whether it is negligence for the defendant to receive and transport cars of other roads in general use, and in the ordinary course of business, which are not constructed with the most approved appliances. Public policy has some bearing on this proposition. It is undoubtedly of great importance to the trade and commerce of the country that a car once loaded should go through to its destination without breaking bulk. It is unnecessary, it is believed, to enlarge on this point, as its importance will be readily acknowledged. Suppose, then, the Union Pacific Railroad Company should deliver a car constructed as these were to the defendant, which was loaded with merchandise destined for New York, and as provided in the Code, section 1292, and in strict accord therewith request the defendant to transport the same, would the defendant be bound to receive such car, and for a refusal would it be liable in damages, the only ground of refusal being that it was dangerous to its employes to transport such a car; while, on the other hand, it would be shown that cars so constructed were in use on all other roads. It is sufficient

to say that it admits of great doubt whether such a defense should be permitted to prevail." (*Baldwin v. Chicago, R. I. & P. R. Co.*, 50 Ia., 680.) A like doctrine has been announced in Illinois, without statutory provision. (See *Indianapolis, B. & W. R. Co. v. Flanigan*, 77 Ill., 365; *Toledo, W. & W. R. Co. v. Black*, 88 Ill., 112.) "Even in the absence of any statute or special contract, regulating the terms of receiving and drawing such cars, the defendant was bound, as a common carrier, to receive and draw them." (*Mackin v. Boston & A. R. Co.*, 135 Mass., 201; *Vermont & M. R. Co. v. Fitchburg R. Co.*, 14 Allen [Mass.], 462.)

In section 4, article 11, of our constitution it is provided: "Railways heretofore constructed, or that may hereafter be constructed in this state, are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law." This constitutional provision, giving it a fair and reasonable construction, is broad enough to include the transportation of cars of one company over the line of another, and cast the duty on a railroad, when cars of another road are tendered, of receiving and transporting them where the gauge is suitable, and the cars offered are not defective, out of repair, or of such construction in whole or in any particular as to be unreasonably dangerous to those who might be obliged to work on or to handle them. (See *Peoria & P. U. R. Co. v. Chicago, R. I. & P. R. Co.*, 109 Ill., 135.) Moreover, aside from the constitutional requirement, we think on principle it must be said that railroads, as common carriers, must receive and transport cars of other roads, when tendered under proper conditions. (*Vermont & M. R. Co. v. Fitchburg R. Co.*, supra; *Mackin v. Boston & A. R. Co.*, supra; *Indianapolis, B. & W. R. Co. v. Flanigan*, supra; *Toledo, W. & W. R. Co. v. Black*, supra.) It was not claimed that these cars were defective, or that they were not in good repair. One branch of the complaint was that the receiving and transporting

of cars having attached to them double buffers constituted negligence. Far the greater number of freight cars belonging to and in daily use on the western railroads, and in this state, have on them what are known as "single deadwoods" on each end of a car, and immediately above the draw-bar attached horizontally, a block or piece of timber about two feet in length, about four inches thick, and four or five inches in height. On these the draw-bars extend beyond the deadwoods several inches, and when the cars are to be coupled the draw-bars are expected to meet as the one car is pushed up to the other, and bear the immediate effect of the consequent shock. If a draw-bar is weak or out of repair, and gives way when a coupling is being made, or if for some reason the draw-bars do not strike, but pass each other as they sometimes do, with the single buffers there is danger to the life of the employe engaged in effecting the coupling.

The evidence in this case disclosed that in coupling cars having double deadwoods there was more hazard to the arm and hand than in performing the same work with those having single buffers; that the double buffers furnished greater security to life than the single; also that coupling cars by hand by the use of the link and pin, whether equipped with single buffers or double deadwoods, is at best a hazardous undertaking, and one which requires care. It was further shown that freight cars with double buffers, similar in construction to the ones on these cars, were in general use by some of the long lines of railway and freight lines, and it was not shown that they have been discarded or prohibited by any. The defendant in error was about twenty-seven years old at the time he was injured, and had been "railroading" some six or seven years; had worked on several different railroads, also as a switchman in the "terminal" yard at Kansas City; had heard of cars with double deadwoods; did not remember to have seen or worked on or about any such cars; had heard the double deadwoods called "man-killers;" knew that they were carried over any and all

railroads of the country.   It appears that there is to the draw-bar ordinarily used on freight cars what is called a head,—"the draw-head."   This is at the end distant from the car, and is hollow, to allow the insertion of the link, which is used to connect the cars.   A few inches back toward the car the draw-bar has a hole through it, into which fits a pin, which extends down through the draw-bar and link, thus effecting the coupling.   It appears that frequently, when cars are to be coupled, the pin is "set" in such manner and position in or on the draw-bar of one of the cars to be coupled that when the cars are brought together the jar which results when the ends of the draw-bars strike causes the pin to drop into place and finish the coupling.   About 8 o'clock, in the evening of October 15, 1891, in Woodlawn, a station in this state, on the line of the plaintiff in error, the defendant in error attempted to couple the two cars on which were the double deadwoods.   They were on a side track or switch, and one had been attached to the train of cars, at the head end of which was the engine.   The defendant in error states that he stepped up to the detached one and set the pin, preparatory to coupling, gave the signal to the engineer to "back up,"—the cars were at the time about fifteen feet apart,—and when they were brought together his hand, with which he had raised and directed the link in its proper direction, was caught between the buffers and mashed.   In this connection, we will call attention to portions of the evidence which have a bearing on the question of the care which was exercised by defendant in error at the time he received the injury.   He stated that he went to the car and set the pin, and we will now quote from the evidence:

Q. Describe it.

A. I set it in the hole so when the link came in it shook the pin down through the link.

Q. This draw-bar is between the deadwoods?

A. Yes, sir.

Q. You was on the outside about even with the deadwoods?

A. Yes.

Q. Now, then, you went there, did you, with the pin in your hands when you went between them?

A. I set the pin.

Q. Did you take the pin in with you?

A. No, sir.

Q. The pin was in the draw-bar?

A. I think so, or else on the deadwood.

Q. How did you manage to set the pin in the hole through the draw-bar?

A. I reached over the top and set it.

Q. You reached over the deadwood?

A. If you come to the end of the car you can see on the face of the draw-bar to set your pin.

Q. You stepped in there by the side of the draw-head and took up the pin and set it in the hole?

A. Yes, sir.

Q. Could you see where you was putting the pin?

A. Yes, sir.

Q. You could see the end of the draw-bar?

A. Yes, sir.

Q. Did you hold your lantern where you could see it?

A. Yes, sir.

Q. And these deadwoods, too?

A. I don't remember of seeing the deadwoods; I wasn't looking for them.

Q. You didn't pay any attention to see whether they were there or not?

A. No, sir.

And further on this subject:

Q. You set the pin in this stationary car before the others began to move back?

A. Yes, sir.

Q. So you went in there by the stationary car and fixed your pin in the hole in the draw-head between these two deadwoods before you signaled to the engineer to back up?

A. Yes, sir.

Q. After doing that you signaled him to back up?

A. Yes, sir.

Q. When he backed up what did you do?

A. I stepped up to this car and took hold of the rod for a hand hold.

Q. With your left hand?

A. Yes, sir; the lantern was in my left hand.

Q. With your back to the moving train?

A. Yes, sir; my back or side. I don't know which you want it. It wouldn't be exactly my back. I was standing in this shape.

Q. You say you would be standing angling toward the car that was approaching, your back toward that car and face toward the drawhead of the stationary car?

A. Yes, sir.

Q. As it came back you caught the link with your hand?

A. Yes, sir.

Q. What did you do?

A. I held it until I thought it was close enough to go in the draw-bar and then I took my hand out, but didn't get it out quick enough.

On page 20 plaintiff is asked:

Q. Did you look to see what kind of a car you coupled? anything about it, what kind of a coupling it was?

A. No, sir; that wasn't my business.

Q. That wasn't your business?

A. No, sir.

Q. You didn't pay any attention to the kind of car you were going to couple?

A. No, sir.

Q. You paid no attention as to what kind of a draw-bar or deadwood the car had?

A. No more than to see that they were there; to see that the pin and link was there.

Q. You saw that, did you?

A. Yes, sir.

Q. Further than that you didn't pay any attention to it, you say?

A. No, sir; I didn't.

Q. You paid no attention to the kind of deadwoods, whether it was a foreign car or whether it was a St. Joe or C., B. & Q. car?

A. I paid no attention to that at all.

As we have hereinbefore concluded, it was the duty of the company to receive and transport these "foreign cars." They were not shown to be faulty, or out of repair, nor was it shown that the deadwoods with which they were equipped were unsuited to the purpose for which they were intended or made, nor that they were unreasonably unsafe or hazardous. From which we must conclude that it was not negligence in the company to receive them and haul them over its road. The question of whether it is an act of negligence for a railway company to receive and draw cars of another company, which have on them double buffers, while its own cars have or are equipped with a different pattern of deadwoods, has been considered in a number of cases, and almost without exception it has been held not to constitute negligence. (*Pittsburg & L. E. R. Co. v. Henly*, 48 O. St., 608; *Michigan C. R. Co. v. Smithson*, 45 Mich., 212; *Hathaway v. Michigan C. R. Co.*, 51 Mich., 253; *Indianapolis, B. & W. R. Co. v. Flanigan*, 77 Ill., 365; *Baldwin v. Chicago, R. I. & P. R. Co.*, 50 Ia., 680; *Kohn v. McNulta*, 13 Sup. Ct. Rep., 298.)

It is a well settled rule that it is the duty of an employer to exercise due care for those in his employment, and not subject them to hazards or dangers by his negligence. It is also well established that one entering into the employment of another assumes the risks ordinarily incident to the employment, including such as are open, apparent, or obvious, or should be to a person of the experience and understanding of the employe. The difference in the danger in coupling cars having double buffers and those having single, is one of degree, and the extra hazard requires a greater degree of care. We have been furnished, in the record, with a photograph, which is said to be a fair representation of the deadwoods on the

cars which the defendant in error tried to couple, and it is very apparent that if a person should approach a car, on which was such an appliance, to do work which required that he place an iron pin in a hole in the draw-bar situated between the timbers of the deadwood, it would be almost an impossibility for him to do so without noticing the construction of the deadwood, unless he was at the time very careless and unobservant. Furthermore, defendant in error, with his six or seven years' experience as a railroad man, knew or must be charged with notice, that cars similar to these were passing back and forth across the country, on any and all the lines of railroad, and that he might be called upon to work on or about one at any time, and must take the necessary care and thought to do so safely; and if it could not be done by the exercise of due care, to refuse to do the task, for no one can or will be called upon to perform an impossible task, or one which cannot be safely performed, if proper care and attention be exercised.

In the opinion in the case of *Michigan C. R. Co. v. Smithson, supra,* wherein the action was predicated on an injury to the hand of an employe of the company, which occurred while he was engaged in an attempt to couple a car which belonged to another company, then being hauled over the road, and which had double deadwoods, it was stated: "But we have had produced for our inspection on the argument a model of the double deadwoods which caused the injury, and it seems impossible to give to the coupler any better or more effectual notification of their presence, and of the difference from those belonging to the defendants than their very form necessarily gives of itself. The difference is very marked and striking, and it is quite impossible to couple the double deadwoods or to approach them for the purpose with any degree of attention without observing it. This is so whether the coupling is done in the daytime or night-time; for in the night every switchman has his lantern with him, or should have it on all occasions. If, there-

fore, a switchman were to declare that he had attempted to couple the double deadwoods without noticing how they differed from the cars of defendant, the conclusion would be inevitable that he had gone heedlessly in the performance of a duty requiring great care, and that he had not allowed his eyes to inform him what was before him. Moreover the business of the road was of itself a notification that many differences requiring attention in coupling were to be encountered by the switchmen and brakemen. The Michigan Central is a great common way for the cars of all the railroad companies of the country, and every man in the employ of the defendant, if he has ordinary intelligence, is perfectly cognizant of the fact. He knows, too, that the cars of the several railroad and transportation companies differ, and that at one time or another all these differences may appear in the cars he may be called upon to couple or uncouple. Every train is likely to have several kinds, and he cannot assume as he passes from one to another that the two will be alike; much less that the whole train will be. To notify him specially of the differences would not only be troublesome and expensive, and oftentimes, as above explained, confusing, but it would be a work of supererogation; for any man capable intelligently of performing the duty would be no wiser after the notice than before; and a man who would not heed the information the very nature and course of the business would impart to him, would be protected by no notice. The best notice is that which a man must of necessity see and which cannot confuse or mislead him; he needs no printed placard to announce a precipice when he stands before it."

In *Hathaway v. Michigan C. R. Co.*, *supra*, another case in which the facts were similar to the circumstances in the case at bar, it was said: "In this case the danger consisted in the brakeman being caught between the two deadwoods as they came together. The deadwoods were in plain sight; they were really the most prominent objects on the end of the cars. The plaintiff had full oppor-

tunity of examining the one by which he stood some moments before the cars came together. Its size, shape, and the location of the draw-bar were before him. He had only to look at it to be informed of any peril surrounding it. The moving car at a distance of 20 feet, with its deadwood and draw-bar in plain view, slowly approached the one where the plaintiff was standing. It does not appear there was any hurry about the business. How could the plaintiff have been better warned? Certainly he knew the car was coming, and could see the deadwoods and draw-bar thereon as well as if he had made the coupling a thousand times before. He could not fail to see if he looked at all. It was no special risk to which he was subjected, but it was common to all that class of cars going daily over the defendant's road, and of which the plaintiff had had, for nearly a week, at least, the opportunity of knowing, whether he availed himself of it or not. The risk in making that coupling was incident to the service the plaintiff had voluntarily engaged in,—one of which, from the very nature of the business, he must, under the circumstances, have been cognizant; and no other or better notice of which could be possibly given than that which the plaintiff had as he stood there and saw the two cars, with the deadwoods approaching each other; and no amount of experience could further or better warn the plaintiff of the dangers then before him in making the unfortunate coupling.   *   *   *   The plaintiff had full opportunity to see and examine the cars from which he received his injury, and all the peculiarities of the double deadwoods, if there were any, and the differences between them and the deadwoods upon the Michigan Central cars, had he looked at them; they were in the very train in which he was injured. He might have seen that the draw-bars of the cars he was injured by projected little, if any, beyond the faces of the deadwoods; that to place his arm between the approaching blocks would inevitably result in injury; and that the way to make the coupling safely was to keep his arm

above or below the deadwoods. All these things were
before him, and it was the simplest of all his duties to
look at them. No youthful inexperience can be offered
as an excuse for his failing so to do; and his failure to
use his lantern and make such observations, under the
undisputed facts and circumstances disclosed in this rec-
ord, shows unmistakably a degree of negligence on the
part of the plaintiff which very largely contributed, if
not wholly, to the injury complained of."

In *Thomas v. Missouri P. R. Co., supra*, we find the fol-
lowing: "The occasional or frequent use of such cars on
any road, in the ordinary course of business, is one of the
ordinary risks an employe assumes. He knows, or is
bound to know, that cars from other roads are being con-
stantly hauled over the road whose employe he is. The
most ordinary observation will teach him this. He must
know these cars may be differently constructed."

In the opinion in the case of *Kohn v. McNulta, supra*,
written by Mr. Justice Brewer, it was stated: "It is not
pretended that these cars were out of repair, or in a de-
fective condition, but simply that they were constructed
differently from the Wabash cars, in that they had double
deadwoods or bumpers of unusual length, to protect the
draw-bars. But all this was obvious to even a passing
glance, and the risk which there was in coupling such
cars was apparent. It required no special skill or knowl-
edge to detect it. The intervenor was no boy, placed by
the employer in a position of undisclosed danger, but a
mature man, doing the ordinary work which he had en-
gaged to do, and whose risks in this respect were obvious
to anyone. Under those circumstances he assumed the
risk of such an accident as this, and no negligence can be
imputed to the employer. (*Tuttle v. Railway Co.*, 122
U. S., 189; 7 Sup. Ct. Rep., 116; *Ladd v. Railroad Co.*, 119
Mass., 412.)"

We must conclude that the company was not negligent
in receiving and hauling these cars over its road, and that
the risks incident to the coupling were assumed by the
defendant in error.

There was some evidence in regard to a coupling-knife and its use on some roads, but there was not evidence sufficient to sustain a finding that the knife was necessary for such couplings as was the one attempted by defendant in error, or that a failure to furnish the knife was an act of negligence which rendered or tended to make plaintiff in error liable for the injury on which this suit is based. It is possible that facts might be shown which would lend force to the position taken in this branch of the case, but they are not in the record before us. (*Hathaway v. Michigan C. R. Co.*, *supra*.)

We will now turn our attention to the examination of the question herein presented, relative to the relief department in regard to the claim that the contract by which the party injured becomes entitled to benefits, if he chooses to take them, is invalid and incapable of enforcement. The question here raised was considered by this court in the case of *Chicago, B. & Q. R. Co. v. Bell*, reported in 44 Neb., 44, and the contract held to be a valid one. We have been furnished with no reasons which seem sufficient to call for a reversal of the views then adopted and announced; hence, we will again approve them herein. (See, also, on this point, *Shaver v. Pennsylvania R. Co.*, 71 Fed. Rep., 931; *Johnson v. Pennsylvania R. Co.*, 29 Atl. Rep. [Pa.], 854; *Owens v. Baltimore & O. R. Co.*, 35 Fed. Rep., 718; *Black v. Baltimore & O. R. Co.*, 36 Fed. Rep., 655; *Donald v. Chicago, B. & Q. R. Co.*, 61 N. W. Rep. [Ia.], 971; *Leas v. Pennsylvania R. Co.*, 37 N. E. Rep. [Ind.], 423; *Ringle v. Pennsylvania R. Co.*, 30 Atl. Rep. [Pa.], 492; *Pittsburgh, C. C. & St. L. R. Co. v. Cox*, 45 N. E. Rep. [O.], 641.) As we have hereinbefore stated, it was pleaded in the reply that "plaintiff further alleges the fact to be that before he could engage in the services of said company he was required and compelled to join said Burlington Voluntary Relief Department and become a regular member thereof." In this it will be noticed there is no direct statement that whatever was done in coercing the defendant in error to join the relief department was by or

for the company, though it is true that it is the inference which must naturally be drawn from the statement, that the requirement was by or for the company; but without regard as to whether this was sufficient, there was no evidence of any undue influence or pressure brought to bear ·by this company to induce the defendant in error to become a member of the relief department, and with such existent conditions and facts at the time the influence was exerted as must be in order to render the contract invalid or voidable.

There is another question which we will notice. The defendant in error having received benefits or payments under the contract by which he became a member of the relief department, if it be conceded that it was a contract which he could avoid at any time by disaffirming, can he now successfully attack it; or, if he might now be allowed to repudiate it, must he first tender a return of what he has received under and by virtue of it? Such a contract may be either ratified or disaffirmed at the option of the aggrieved party. (Clark, Contracts, 373.) The defendant in error admitted in his reply that he had received benefits under the contract, and, so far as we are informed by the evidence introduced on this branch of the case, there were no facts which would tend to show that his actions in receiving the payments were without full knowledge and information of the effect of such acts on his part, or that they were done by other than his own free will and accord. What may be developed at another trial remains for the future. On the subject of the necessity of the tender of the return of the benefits received it has been said: "A release of a claim for damages for injuries received through negligence, obtained by fraud, is valid until disaffirmed by tendering back the consideration. (*Kreuzen v. Forty-second St., M. & St. M. Ave. R. Co.*, 13 N. Y. Supp., 588.)

The judgment of the district court must be reversed and the case remanded for further proceedings.

. REVERSED AND REMANDED.