UNITED STATES v. UNION STOCK YARDS CO. OF OMAHA.

(District Court, D. Nebraska. February 21, 1908.)

COMMERCE—INTERSTATE COMMERCE—STOCK YARD—SAFETY APPLIANCE ACT—
"COMMON CARRIER."

    The defendant, the Union Stock Yards Company of Omaha, in connection with the business of furnishing facilities for stock yards, operates 35 miles of railroad, over which are hauled all the cars offered for shipment by any industry located on the line of said railroad, and all cars consigned to any such industry, and also cars from one railroad to another in course of shipment from one state to another, for which an arbitrary switching charge is made. *Held*, that defendant, in operating such railroad, is a common carrier, engaged in interstate commerce within the safety appliance acts. Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), amended April 1, 1896, c. 87, 29 Stat. 85,

and March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885).

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, pp. 1313, 1319; vol. 8, p. 7607.]

(Syllabus by the Court.)

Charles A. Goss, U. S. Atty., A. W. Lane, Asst. U. S. Atty., and Luther M. Walter, Special Asst. U. S. Atty.

Frank B. Ranson, for defendant.

T. C. MUNGER, District Judge. This is an action wherein the United States seeks to recover from the defendant penalties for two alleged violations of the acts of Congress, known as the safety appliance acts. The first count of the petition charges that the defendant at a certain date used on its line of railroad its own locomotive engine in moving a car containing interstate traffic, consigned from a point in Iowa, to South Omaha, Neb., and that the engine was out of· repair and inoperative on account of the uncoupling levers being missing from the ends of the locomotive. The second count charges that the defendant hauled on its line a certain railroad car used in· moving interstate traffic, consigned from a point in Iowa to South Omaha, Neb., while the coupling apparatus was inoperative and out of repair.

The question presented by the answer and arising under the evidence is whether or not the defendant is a common carrier, or was engaged in interstate commerce by railroad. The case has been submitted under an agreed statement of facts. It appears therefrom that the defendant is a corporation organized under the laws of the state of Nebraska, and among its chartered powers are the·right "to construct; maintain, and operate a railroad with tracks of other railroad companies, which shall be operated for the purposes of its business as set forth, as well as also of carrying passengers and freight for the general public." The defendant was organized for the further purpose of conducting stock yards and certain business in connection therewith. The defendant owns a large tract of land at South Omaha, Neb., on which it has constructed buildings and sheds and pens of the general nature of stock yards. Adjoining defendant's grounds and located on the margin thereof are five large slaughtering and packing houses wherein stock is slaughtered and the product packed and prepared for shipment to market. The defendant for many years has had railroad tracks leading over its premises from a transfer track connecting with the other railroads which enter South Omaha, and which lead to the buildings and sheds and pens on its premises, and to the slaughtering and packing plants mentioned, and to certain other industries located along the defendant's railway tracks in South Omaha. The defendant has' locomotive engines of its own which it operates upon these tracks, and has three flat cars and one box car. The flat cars are used for the purpose of picking up and hauling refuse and cinders over its tracks, and the box car is used as a tool storage car. None of these cars are carried beyond the defendant's premises. The defendant receives on this transfer track cars

that are loaded with live stock and other freight, whether shipped from points within the state or from points in other states, and attaches its own locomotive to such cars and moves them as follows: Cars that are loaded with live stock are hauled by the defendant's locomotive to the packing houses or other place of ultimate destination in South Omaha along the defendant's tracks. Cars loaded with freight consigned to other industries than the packing houses are likewise hauled to such industries or such place of destination. As to freight originating at South Omaha at these industries or packing houses, the defendant attaches its engine to such cars and hauls the cars, if they are loaded with packing house products, to the transfer track, and there delivers the same to the railroad designated by the persons operating the packing plant, and it receives from the industries other than packing houses cars that are loaded by them and likewise hauls them to the transfer track, where they are delivered to the railroad company designated by the persons operating the industries. The defendant company also hauls empty cars in the same manner as these loaded cars are hauled. All of the railroad companies whose tracks enter South Omaha, or who reach the transfer track, are common carriers, and are engaged in moving interstate commerce. About 45 per cent. of the live stock so received annually from these other railway companies by the defendant is shipped from states other than the state of Nebraska, and about 87 per cent. of the live stock loaded into the cars at the defendant's yards and delivered to the railroad companies on the transfer track is destined to points in states other than Nebraska. The defendant also receives cars from these railroad companies on its transfer track to be carried to the stock yards of the defendant, where the stock may be emptied into the stock pens, and also receives empty cars to be likewise hauled to the stock yards, where they may be loaded with live stock, and thereupon hauls such cars back to the transfer track to be likewise delivered to the railroad companies. Live stock is loaded and unloaded at the yards by the defendant company; other freight is loaded and unloaded by the persons to whom the cars are consigned. There are about 35 miles of railroad tracks belonging to the defendant, situated on its premises and connecting with the eight or ten railroads mentioned by means of this transfer track. The defendant transfers upon its transfer tracks cars for the different railroad companies from one railway company to another, whenever requested by the said railroad companies connecting with its track so to do, and the defendant is paid a fixed and definite charge for so doing. The road requesting the transfer requests that certain cars designated be transferred upon the defendant's transfer tracks, stating to what tracks or other road they are to be transferred. The defendant handles all cars offered to it by the railroads connected with its tracks, and transfers cars from one industry to the other on request of such industries. These charges are based on a car basis. These charges for handling cars for the railroad companies are collected on the first of each month. It does not issue slips or waybills to the consignor or consignee for any car received or moved by it. When the owner of live stock in the defendant's yards desires to ship

the same out of the yards, he makes a written order, and files it with the defendant for a certain number of cars, giving the name of the consignee and the destination, and requesting the delivery of the cars to the railroad designated. This is called a "shipping order." The defendant also receives at the same time what is called a "billing order," naming the railroad, the consignor, the consignee, and the destination of the shipment, and these are delivered to the agent of the railroad company named in such orders, and upon its receipt the railroad company issues a bill of lading to the shipper, and delivers the number of cars requested upon the transfer track. Thereupon the defendant company takes the cars into its yards, and loads the live stock of the consignor into the cars, and then the cars are set back on the transfer track for the railroad company to carry to destination. The railway companies pay the defendant a fixed charge under the terms of an agreement between the stock yards company and the different railroad companies. The manner of receiving freight destined to points in the defendant's yards is for the railway company to deliver to the stock yards company a waybill and to set the cars upon the transfer track. The waybill shows the point of origin and the point of destination. As to manufactured products and dead freight coming from the industries located on the defendant's premises and tracks and to be carried out of the yards on orders from the railroad companies, the defendant does not know the destination of such cars and issues no bill of lading or waybill or other memorandum with reference to the shipment of these cars, and the same is true as to all dead freight received for any of the industries to be carried to any point on defendant's premises. The defendant quotes no rates for the carriage of freight, whether live stock or dead freight, but collects all of the freight charges on incoming live stock, when not prepaid, as an accommodation to the railroad companies, and it pays this amount over weekly to the railroad companies. The defendant collects no freight charges on outgoing live stock or dead freight. The charges of the defendant to the railroad companies for service rendered the railroad companies are paid for by the railroad company requesting the service to be performed. These charges are fixed and definite, under a contract with the railroad companies. The charges for taking in empty cars and taking out loaded cars are always the same, and these charges are not fixed with reference to the distance outgoing freight is to be carried or incoming freight has been carried, but are simply arbitrary charges fixed by the contract between the railroad companies and the defendant. Defendant does not join with any of the railroad companies in fixing the amount of charges for carrying freight out of the yards to points outside of the yards, nor as to freight carried from outside of the defendant's yards into its yards, nor does the defendant join with any railroad company in making any tariff charges for the carriage of freight at all, nor does it receive any portion of the money due from freight bills for carrying freight in or out of the defendant's yards. Live stock which is consigned to points in the yards is generally consigned to a live stock commission agent, to whom it is delivered by the stock yards company. The live-stock agent sells the

shipment for the owner, and if the freight charges have not been prepaid to the railroad company he pays those freight charges to the stock yards company, which collects it for the railroad company and pays it over weekly to the railroad company. For the purpose of informing the stock yards company what the freight charges due to the railroad company for live stock coming into the yards are, if they have not been prepaid, a memorandum is furnished to the stock yards company. The defendant pays over to the railroad companies all the freight charges it receives, deducting no portion of the same on any account, but presents its bills for switching service to the railroad companies monthly and is paid by them. The defendant receives no broken freight, but handles only empty and loaded freight cars. It handles about 625 cars daily of live stock over its railroad. The charges made for handling the cars in the method above described are arbitrarily fixed at 50 cents, $1, and $2 per car. It is stipulated that the cars alleged in the petition were received and hauled by the defendant company, and that they had been consigned by shippers in another state than Nebraska to be delivered to the consignees at South Omaha, Neb., at some point in the defendant's yards or at one of the packing plants hereinbefore mentioned. Each of these cars was loaded with coal, and in order to reach the consignee at its destination it was necessary for the defendant company to haul the car from its transfer track to the consignee, and the contract of shipment covered the delivery at the ultimate point of destination in the defendant's yards, or to one of the packing plants. It was also stipulated that the cars were out of repair, as alleged in the petition.

The defendant contends that it is not subject to the acts of Congress relating to safety appliances, approved March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. 1901, p. 3174), amended April 1, 1896, c. 87, 29 Stat. 85, and March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), for the reason that it is not a common carrier, and is not engaged in interstate commerce by railroad. It may be questioned whether a railroad company must be a common carrier in order to bring it within these acts, since the amendment approved March 2, 1903, makes the provisions and requirements of that amendatory act, as well as of the original act as amended, apply to all "cars and similar vehicles used on any railroad engaged in interstate commerce."

A railroad has been defined as a road or way on which iron rails are laid for wheels to run on for the conveyance of heavy loads and vehicles. Dinsmore v. Racine M. R. Co., 12 Wis. 649. Such a track is a railroad independently of the use made of the track in the hauling of cars over it, as was pointed out in L. S. & M. R. Co. v. U. S., 93 U. S. 442, 23 L. Ed. 965.

In this case the road is not a mere switch maintained for the private purpose of the defendant, nor are cars delivered to the consignees when they are set upon the transfer track, and therefore an essential part of the transportation of the cars and freight therein contained is unfinished. Over the 35 miles of track of the defendant is hauled all the live stock consigned to commission agents and others who supply

the five meat packing houses of South Omaha, one of the greatest centers of that industry in the United States. All the products of the packing houses are hauled away over this road as the initial carrier, in the routes to the destination of such products. In addition, the defendant road operates as a connecting carrier between all the 8 or 10 trunk line railroads entering South Omaha, and transfers cars from any road to any other road upon request. For instance, cars that may be consigned from shippers in Colorado or Dakota to consignees in Missouri or Illinois are regularly switched over the defendant's railway from one carrier to another as a part of the interstate transportation of the freight in such cars, the defendant using its own engine and servants in hauling such cars. The defendant also receives freight for other industries upon its lines. The live stock hauled over the defendant's road amounts to about 625 cars per day.

· The defendant has not built nor maintained its railway as a private track for its own use, but has devoted it to a public use. Not only is this true of the greater portion of the track, but it is especially true of the transfer track. That track is used by all the railway companies entering South Omaha as a track upon which to switch cars. This transfer track in undoubtedly a railroad, and the defendant hauled the cars in question over a portion of this track. If the methods adopted by the defendant relieve it from the obligations of a common carrier by railroad, no reason is perceived why subsidiary companies could not own the switch yards or belt railroads of each city or village, and by the device of making all deliveries upon a transfer track monopolize the carriage of all freight traffic between the main line railroads and the shippers and consignees in such city or village, and thus escape the obligation of common carriers. The defendant, having chosen to devote its railroad tracks to a public use, must be held to be a common carrier. Norfolk v. Commonwealth, 103 Va. 289, 49 S. E. 39; State ex rel. v. Willmar & S. F. Ry. Co., 88 Minn. 448, 93 N. W. 112; Mo. Pac. v. Wichita, 55 Kan. 525, 40 Pac. 899; Peoria R. R. v. Chicago R. R., 109 Ill. 135, 50 Am. Rep. 605; Peoria R. R. v. United States R. S. Co., 136 Ill. 643, 27 N. E. 59, 29 Am. St. Rep. 348; Penn. R. R. Co. v. Ellett, 132 Ill. 654, 24 N. E. 559.

In this case the defendant must be held to be a common carrier for another reason. The Constitution of Nebraska, art. 11, § 4, declares that "railways heretofore constructed, or that may hereafter be constructed in this state, are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law. * * * The liability of railroad corporations as common carriers shall never be limited." Under this section it is one of the duties of the defendant company, as a common carrier, to receive and transport over its line of road cars of other companies, if the gauge of the road is suitable and the cars are not defective or out of repair, or of such unusual and peculiar construction as to be unreasonably hazardous or dangerous to work with or handle. C., B. & Q. R. R. Co. v. Curtis, 51 Neb. 442, 71 N. W. 42, 66 Am. St. Rep. 456.

The second contention of the defendant is that it was not, at the time charged in the petition, engaged in interstate commerce. Since the submission of this case, this question has been settled by the Circuit Court of Appeals in this circuit, in the case of United States v. Colorado & Northwestern R. R. Co. (decided November 25, 1907) 157 Fed. 321, 342. See, also, United States v. Nor. Pac. Terminal Co. (D. C.) 144 Fed. 861.

For these reasons judgment will be entered in favor of the government and against the defendant upon each count.